UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| SHIRLEY GOLDEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 4:10-cv-04081-SLD |
| MICHAEL J. ASTRUE, COMMISSIONER | ) |
| OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

ORDER

This matter is now before the Court on Plaintiff Shirley Golden's Motion for Summary Judgment (ECF No. 8) and the Social Security Administration ("SSA") Commissioner's Motion for Summary Affirmance (ECF No. 12). The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). Plaintiff argues that the ALJ's decision was clearly erroneous because the ALJ failed to consider the proper factors when assessing her credibility and that the ALJ's Residual Functional Capacity ("RFC") determination was not supported by substantial evidence. For the reasons set forth below, the Court GRANTS Plaintiff's Motion for Summary Judgment, DENIES Defendant's Motion for Summary Affirmance, and REMANDS the case to the Administrative Law Judge for further proceedings consistent with this order.

I.  **BACKGROUND**

This case was brought by Shirley Golden ("Golden") on November 15, 2010, challenging the SSA's determination that she was not disabled and, accordingly, not entitled to benefits. At the time of the SSA's administrative hearing on October 20, 2009, Golden was fifty-five years old. (*See* Social Security Transcript (the "Record," hereinafter "R.") at 28-30, ECF No. 5.) She

had completed one year of college in 1993. (R. at 124.) She last worked as a telemarketer in the early 1990s. (R. at 135, 184.)

Golden applied for Supplemental Security Income ("SSI") with the SSA on December 15, 2006, alleging a disability onset date of May 18, 2004. (R. at 46-47.) In her initial Disability Report, Golden alleged that she suffered from bipolar disorder and schizophrenia. (R. at 121.) Because of these illnesses, she had not worked for the past several years. (R. at 121.) When asked about her daily activities, Golden noted that she watched television or looked out the window. (R. at 126.) She stated that she needed daily reminders to bathe and get dressed. (R. at 127-28.) She also stated she was unable to go outside and had difficulty sleeping. (*Id.*) Finally, Golden noted that her illnesses affected her ability to stand, memory, ability to complete tasks, concentration, understanding, ability to follow instructions, and use of her hands. (R. at 131.)

As part of her application, Golden's mental and physical capabilities were evaluated by trained medical professionals. Golden's first relevant examination occurred on January 8, 2007, when Senior Psychological Examiner Perry Adams ("Adams") conducted a consultative examination. (R. at 184-188.) Adams noted that no medical or psychological data was provided before his evaluation. (R. at 184.) Adams observed that Golden appeared to be "open and honest in her interactions" and that she provided a credible presentation of her symptoms. (R. at 187.) Her vocalizations were "clear and coherent" and her judgment and insight were "fair." (R. at 185.) Adams noted that Golden was not currently taking any medication. (R. at 185.) Golden reported she cried often and felt sad "all of the time." (R. at 186.) During the exam, Adams noticed that Golden appeared "quite uncomfortable" and exhibited psychomotor retardation, mild distress, and tearfulness. (R. at 186.) Adams diagnosed Golden with Bipolar Disorder and concluded that she suffered from moderate limitations in understanding and remembering,

moderate limitations in adapting to change, severe limitations in sustaining concentration and persistence, and severe limitations interacting with others. (R. at 187.)

Golden's records were then reviewed by Dr. Frank D. Kupstas, who, on February 23, 2007, filed a Psychiatric Review Technique Form ("PRTF") of Golden.[1]  (R. at 189-205.)  Dr. Kupstas provided an assessment of Golden's functional limitations, concluding that she was moderately limited in performing activities of daily living, social functioning, and maintaining concentration, persistence, or pace.  (R. at 199.)  Dr. Kupstas concluded that Golden was only moderately limited based, in part, on the fact that Golden was able to attend to her personal hygiene, watch television, perform light household chores, attend church, create a budget, shop with others, and fill out her own SSI application.  (R. at 201.)

Golden's claim was first denied on March 8, 2007.  (R. at 48-51.)  Golden sought reconsideration on April 17, 2007, but the claim was again denied.  (R. at 52-56.)  Thereafter, on July 30, 2007, Golden visited her treating physician, Dr. Robert Lawton, and underwent another psychiatric evaluation.  (R. at 217.)  During the evaluation, Golden reported periods of depression, difficulty sleeping, and occasional periods of excessive energy.  (*Id.*)  She also mentioned that she experienced thoughts or voices that she found difficult to dismiss.  (*Id.*)  Dr. Lawton observed that Golden recounted her story "in a credible fashion," but noted "mild psychomotor retardation."  (*Id.*)  He also found Golden to have "intact memory and concentration" while her judgment and insight were "fair."  (R. at 218.)  Ultimately, Dr. Lawton diagnosed Golden with Bipolar I Disorder.  (*Id.*)

---

[1] Dr. Kupstas did not examine Golden.  Rather, he relied on the medical evidence in Golden's record to arrive at his conclusions.

Golden appealed these denials and supported her appeal by updating the information in the record concerning her alleged disability by filing two disability reports using form SSA-3441. (R. at 143-49, 153-59.) In these reports, Golden provided additional assertions regarding her inability to concentrate and asserted that her disabilities had been further complicated by here recent development of diabetes. (R. at 144, 148, 157.) On November 20, 2007, as part of her appeal, Golden requested a hearing before an Administrative Law Judge. (R. at 57.)

After initiating her appeal, Golden returned to Dr. Lawton twice more. (R. at 240.) On January 24, 2008, she reported more difficulty sleeping, increased depression, difficulty keeping track of time, and confusion. (*Id.*) Dr. Lawton noted that she asked him to fill out a form certifying her inability to work. (*Id.*) On March 10, 2008, Golden reported similar symptoms as before. (R. at 243.) However, Dr. Lawton noticed discrepancies in her medication reports which "suggested a certain lack of candor." (*Id.*) Dr. Lawton and Golden agreed to meet in six weeks to determine the effectiveness of her treatment, but Golden never responded to requests for treatment planning. (R. at 245.)

An administrative hearing was held on October 9, 2009, and Golden testified that she lived with her daughter and her three grandchildren. (R. at 30.) When asked whether she was able to take care of her personal hygiene needs, Golden responded, "[w]hen I remember." (R. at 34.) She later testified that her daughter and granddaughter cook, clean, and take care of her, noting that they leave notes around the house to remind her of appointments. (R. at 37.) Golden stated she left the house "maybe twice" a month in order to attend doctor appointments, but otherwise was prone to panic attacks. (*Id.*) Throughout the hearing, Golden testified that she experienced nervousness around other people and felt uncomfortable going outside of her apartment. (R. at 33.) She also experienced confusion, often forgetting or losing track of

time. (*Id.*)  Later, Golden testified she suffered from debilitating headaches on a daily basis.  (R. at 34-35.)  She stated that she suffered from diabetes and her blood sugar remained out of control.  (R. at 35-36.)

On January 25, 2010, the ALJ determined that Golden did not meet the criteria of disability set forth in § 1614(a)(3)(A) of the Social Security Act and was therefore ineligible for SSI.  (R. at 9.)  The ALJ found that Golden had two severe impairments: affective disorder and a history of substance abuse.  (R. at 17.)  The ALJ concluded, however, that Golden did not have an impairment or combination of impairments that met or medically equals one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926).  (R. at 18.)  After consideration of the entire record, the ALJ found that Golden had RFC to perform a full range of work at all exertional levels but with the following non-exertional limits: jobs with limited to occasional contact with the public, co-workers, and supervisors; jobs with no more than average production quotas, and; jobs with little change in the job process.  (R. at 18-19.)  With this RFC assessment, the ALJ concluded Golden could perform jobs that existed in significant numbers in the national economy.  (R. at 21.)

Golden challenged the ALJ's decision and filed a Request for Review.  (R. at 8.)  On September 10, 2010, the Appeals Council denied review of Golden's claim and the ALJ's decision became the final decision in her case.  (R. at 1-3.)  Having exhausted her administrative remedies, Golden filed this action.

II.   **STANDARD OF REVIEW**

The law governing a claimant's entitlement to SSI benefits and the Court's role in reviewing their denial was set forth in this Court's *Piper v. Astrue*, No. 10-1366, 2011 WL 3421149 (C.D. Ill. Aug. 5, 2011), decision:

In order to be entitled to [benefits], a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. *See* 20 C.F.R. §§ 404.1566, 416.966 (1986).

The establishment of disability under the Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382(c)(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step test. *See* 20 C.F.R. §§ 404.1520, 416.920.

The five-step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed; (2) is the plaintiff's impairment "severe" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments (20 C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous. *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504 (1985);

*Imani v. Heckler*, 797 F.2d 508 (7th Cir. 1986), *cert. denied,* 479 U.S. 988, 107 S.Ct. 580 (1986).

2011 WL 3241149, at *3-4.

Additionally, the Court must review the written decision of the ALJ, not the reasons later articulated by the Commissioner. *SEC v. Chenery Corporation*, 318 U.S. 80, 87-88 (1943); *Jelinek v. Astrue,* 662 F.3d 805, 811 (7th Cir. 2011).; *Smith v. Astrue*, 2012 WL 767798, at *1, *3 (7th Cir. June 12, 2012). When an ALJ fails to adequately support his conclusions, "remand is appropriate." *Jelinek v. Astrue,* 662 F.3d at 811.

## III. ANALYSIS

In her appeal, Golden argues two issues: (1) the ALJ failed to consider the proper factors when assessing her credibility; and (2) the ALJ's RFC assessment was not supported by substantial evidence.

### A. The ALJ's Credibility Determination

Golden first argues the ALJ failed to evaluate the proper factors when assessing her credibility. Pursuant to the Social Security Administrations interpretation policy, a claimant's subjective description of a physical or mental impairment is evaluated under a two-step process. *See* SSR 96-7p, 1996 WL 374186 (July 2, 1996). First, the ALJ is required to assess whether there exists an "underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce the individual's pain or other symptoms." *Id.* If such an impairment exists, the ALJ must determine the "intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id.* If the claimant reports symptoms that are "not substantiated by objective medical evidence," the ALJ must determine the credibility of these statements in light of the entire record. *Id.*

7

Assessing a claimant's credibility requires the ALJ to consider various factors beyond the objective medical evidence. These factors include the claimant's daily activities, the intensity and duration of symptoms, and medications the claimant takes to alleviate symptoms. SSR 96-7p. The ALJ must then state "specific reasons" for his credibility determination of the claimant's statements. *Id.* Unsubstantiated statements that the claimant's symptoms have been "considered" will not suffice. *See Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010). Rather, the ALJ is obligated to state enough of the rationale underlying his credibility determination so the claimant and reviewing bodies understand why the credibility determination was reached. *See Herron v. Shalala,* 19 F.3d 329, 333-34 (7th Cir. 1994). However, as the ALJ directly observes and interacts with the claimant at the hearing, courts give "special deference" to an ALJ's credibility determination. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Accordingly, an ALJ's credibility determination is subject to reversal only if it is "patently wrong." *Id.*

Here, the Court finds that the ALJ did not properly assess the credibility of Golden's testimony, her statements about her illnesses to doctors, and other evidence in the record supporting her impairment. The only reference to a credibility determination was in the RFC assessment, in which the ALJ stated: "In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p." (R. at 19). As it stands, this statement does not satisfy SSR 96-7p's requirement that an ALJ give specific reasons tailored to the individual case when explaining his credibility determination. Indeed, the Seventh Circuit has repeatedly rejected the adequacy of formulaic language, such as that used in the ALJ's decision here, finding it

"meaningless" and inadequate. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). *See also Parker*, 597 F.3d at 921-22; *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012). The ALJ's conclusory disclaimer does not explain whether he found Golden to be credible, nor does it assist this Court in understanding his assessment.

Throughout his decision, the ALJ acknowledged the symptoms reported by Golden during past medical evaluations, but failed to evaluate the credibility of Golden's statements. (R. at 19-21.) For example, the ALJ summarized Adams' consultative notes of Golden, describing her depression, her difficulty sleeping, and her lack of a daily routine. (R. at 19.) He also recounted Golden's examinations with Dr. Lawton and noted that Golden reported alternating periods of depression and mania, difficulty sleeping, anxiety, and nervousness. (R. at 20.) However, nowhere in his decision did the ALJ explain how this medical evidence factored into a determination of Golden's credibility. The ALJ also never discussed Golden's own testimony regarding her symptoms and living situation, such as her testimony that she left the house only twice a month, suffered from panic attacks, and largely relied on her daughter and grandchildren to care for her. (R. at 27.) In light of Golden's history of psychological problems and Bipolar I disorder, the ALJ should have discussed the credibility of this testimony and how the credibility determination was weighed in coming to the ultimate conclusion that Golden was not disabled. *See Villano v. Astrue*, 556 F.3d 558, 562-63 (7th Cir. 2009). While it is true the ALJ is not required to expressly discuss every piece of evidence from the record, he cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron,* 19 F.3d at 333. By failing to determine Golden's credibility in light of the medical evidence, the ALJ's decision did not fulfill the requirements set forth in SSR 96-7p . *See id.* at 333-34.

B.     The ALJ's RFC Assessment

Golden's second argument is that the ALJ improperly evaluated her Residual Functional Capacity assessment. An RFC determination "must be based on *all* of the relevant evidence in the case record." SSR 96-8p, 1996 WL 374184 (July 2, 1996) (emphasis in original). This includes medical history, reported daily activities, recorded observations, need for a structured work environment, the effects of treatment, and medical opinions. *Id.* The ALJ must consider all limitations and restrictions resulting from the claimant's impairments when determining the claimant's RFC, including those which are not deemed severe. *Id.* Furthermore, the ALJ is required to cite to specific medical or non-medical evidence when explaining his decision. *Id.* If the ALJ's RFC determination conflicts with a medical opinion in the record, the ALJ is required to explain why he did not adopt the position. *Id.* Additionally, the ALJ must explain any material inconsistencies between his RFC assessment of the claimant and the evidence in the record. *Id.*

In this case, the ALJ concluded that Golden possessed capacity to perform a full range of work at all exertional levels but with the certain non-exertional limits noted above. (R. at 18-19.) The ALJ based this determination on his belief that there was no indication Golden had difficulty getting along with others, no evidence Golden was incapable of performing basic living activities, no evidence Golden's condition had significantly decreased since she last worked, and that Golden had not experienced significant deficits in concentration, for otherwise she would have sought treatment. (R. at 20.)

However, the ALJ failed to adequately explain three material inconsistencies between the RFC determination and the evidence within the record. First, the ALJ failed to address inconsistencies between his findings about Golden's concentration and the medical opinion of

Adams, Golden's examining psychiatrist. Specifically, the ALJ found Golden possessed only a moderate limitation in interacting with others whereas Adams opined that Golden had a severe limitation in interacting with others. If an RFC determination conflicts with a medical opinion in the record, the ALJ must explain why he did not adopt the opinion. *See* SSR 96-8p. Yet, in his decision, the ALJ here ignored Adams' opinion altogether and provided no justification for departing from it. The Court recognizes that an ALJ is not required to address every piece of evidence before him; however, he still must adequately support his conclusions. *Jelinek,* 662 F.3d at 811. In this instance, the ALJ failed to do so by disregarding contrary medical evidence. *See* SSR 96-8p.

Second, the ALJ failed to properly address material inconsistencies between the record and his determination that Golden was capable of living independently. In his decision, the ALJ concluded that there was no evidence Golden was incapable of caring for herself and there was no evidence that she was relied on others for her daily care. (R. at 20). But Golden testified at the hearing that she lived with her daughter and grandchildren (R. at 30), and that they cared for her. (R. at 37). She further testified that her family cooks for her, cleans, and leaves her reminders. (R. 37). Golden also noted on her Function Report that she needed daily reminders to bathe and dress herself, she had no household responsibilities, and she could only leave the house to go shopping if someone assisted her. (R. at 128-29.) In short, contrary to the ALJ's conclusion, there was material evidence that Golden was incapable of caring for herself. While the ALJ could have disfavored this evidence, he is nevertheless required to explain any material inconsistencies, which he failed to do.

Finally, the ALJ failed to properly address inconsistencies between the record and his determination that Golden only suffered from a moderate limitation in concentration. The ALJ

based this conclusion on his findings that Golden was capable of past college and work experience over twenty years ago.  This finding conflicts with Golden's testimony that her family left notes around the house for her, that she had difficulty concentrating, and that she missed appointments as a result of her poor memory. (R. at 33, 37-40).  It also conflicts with the medical notes of Golden's examining and treating physicians who explicitly noted her difficulty in concentration and memory function.  By not explaining the reasons why he discounted this testimony, the ALJ failed to adequately support his conclusions as required by SSR 96-8p.  Again, the ALJ erred in ignoring inconsistencies between the record and his findings and thus, failed to construct a "logical bridge" between the evidence and his conclusions.  *Terry v. Astrue*, 580 F.3d 471 (7th Cir. 2009).

## IV.  CONCLUSION

For the foregoing reasons, Golden's Motion for Summary Judgment [8] is GRANTED. Motion for Summary Affirmance [12] is DENIED.  The remaining arguments need not be addressed as this case is REMANDED to the Administrative Law Judge for further proceedings consistent with this order.

Entered this 14th day of August, 2012.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE